FILED 10 APR 20 14:40USDC-ORP

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

UNITED STATES OF AMERICA,                    07-CR-47-BR

        Plaintiff,

                              OPINION AND ORDER

v.

MILENKO KRSTIC,

        Defendant.


**DWIGHT C. HOLTON**
United States Attorney
**DAVID L. ATKINSON**
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR 97204-2902
(503) 727-1000

        Attorneys for Plaintiff

**STEVEN T. WAX**
Federal Public Defender
**CHRISTOPHER J. SCHATZ**
Assistant Federal Defender
101 S.W. Main Street
Suite 1700
Portland, OR  97201
(503) 326-2123

        Attorneys for Defendant


1 - OPINION AND ORDER

BROWN, Judge.

This matter comes before the Court on Defendant Milenko Krstic's Motion (#20) to Suppress.  For the reasons that follow, the Court **DENIES** Defendant's Motion.


## BACKGROUND

### I.   Immigration History

In 1998 Defendant Milenko Krstic applied for refugee status and immigration to the United States from Bosnia.  On May 14, 1998, Defendant signed an I-590 Form (Registration for Classification as a Refugee) on which "not served" was marked in Section 13 under "Military Service."  Defendant entered the United States as a refugee on August 20, 1998.

On August 22, 1999, Defendant signed an I-485 Form (Application to Register as a Permanent Resident or Adjust Status) to become a Lawful Permanent Resident.  Part C of the I-485 Form required Defendant to list his present and past membership or affiliation with "every political organization, including foreign military service."  Part C is blank on Defendant's I-485 Form.

On April 13, 2001, Defendant received his alien registration receipt card.

### II.  Procedural History

At some point military records for the Zvornik Infantry

2 - OPINION AND ORDER

Brigade, Army of the Republika Srpska, became available for the United States government to cross-check with the immigration files of Bosnian refugees.  During the cross-check in 2005, the Bureau of Immigration and Customs Enforcement (ICE) began to suspect Defendant and his brother, Ostoja Krstic, had falsely denied in their immigration applications that they had served in the military.

In September 2005 ICE Special Agent Theodore Weimann was assigned to investigate.  On September 30, 2005, he interviewed Defendant to determine, among other things, whether he had served in the Zvornik Brigade during the Bosnian war.  After further investigation, ICE agents seized Defendant's alien registration receipt card on December 11, 2006, pursuant to a warrant.

On February 14, 2007, a Grand Jury indicted Defendant for Fraud and Misuse of Visa in violation of 18 U.S.C. § 1546(a).  The Indictment charged Defendant with knowingly possessing an alien registration receipt card that Defendant knew was procured by means of a false claim and statement.  Specifically, Defendant is charged with making a false statement:  that he had never served in the military when, in fact, he was a member of the Zvornik Brigade from 1992 through 1995.[1]

---

[1] On February 14, 2007, the Grand Jury also indicted Ostoja Krstic separately for Fraud and Misuse of Visa in violation of 18 U.S.C. § 1546(a).  That matter, 07-CR-48-KI, is assigned to the Honorable Garr M. King.

3 - OPINION AND ORDER

On September 7, 2007, Defendant filed a Motion to Dismiss
the Indictment on the grounds that (1) the Indictment does not
include an allegation as to the essential element of materiality,
(2) the facts alleged do not constitute an offense subject to
prosecution under federal law, and (3) prosecution is barred by
the statute of limitations.  Defendant also filed a Motion to
Suppress.

On October 17, 2007, the government obtained a Superseding
Indictment in which Defendant is charged with making "materially
false claims and statements and otherwise fraudulently
obtain[ing]" an alien registration receipt card.  Specifically,
the Indictment charges Defendant with falsely stating in his Form
I-590 that he had never served in the military and failing to
report in his I-485 form that he had served in the military,
"thereby failing to reveal that, in truth and in fact, defendant
was a member of the Zvornik Infantry Brigade, Army of the
Republika Srpska, from approximately 1993 through 1995."

After hearing oral arguments and receiving supplemental
briefs, the Court issued an Opinion and Order on December 10,
2007, in which it adopted Defendant's suggested interpretation of
the statutory phrase "*any such* alien registration receipt card"
in paragraph one, § 1546(a), as referring to the requirement in
the first part of paragraph one that the alien registration
receipt card must be forged, counterfeited, altered, or falsely

4 - OPINION AND ORDER

made.  Thus, because the Court concluded knowingly possessing an
immigration document procured by means of a false claim or
statement does not constitute a violation of paragraph one,
§ 1546(a), unless the person also knows the document obtained by
a false claim or statement was forged, counterfeited, altered, or
falsely made, and because the Superseding Indictment did not so
allege, the Court granted Defendants' Motion to Dismiss the
Indictment.  Having dismissed the Indictment, the Court did not
consider Defendant's Motion to Suppress.  The government
appealed.

The Ninth Circuit was not persuaded by the arguments of
either Defendant or the government as to the correct construction
of paragraph one, § 1546(a).  After finding that existing case
law was unhelpful and evaluating the applicable legislative
history, the court held the statute does not require the
immigration document to be forged, counterfeited, altered, or
falsely made.  Accordingly, on December 4, 2009, the Ninth
Circuit reversed and remanded this matter for further
proceedings.

On February 2, 2010, after remand, Defendant reasserted his
September 7, 2007, Motion to Suppress Evidence and Statements in
which Defendant seeks to suppress:

    1.   All statements seized as a consequence of the
       interrogation of Mr. Krstic that occurred on September
       30, 2005, on the grounds that (a) said interrogation
       was custodial and was not preceded by a Miranda warning

and/or (b) all statements made by Defendant were
involuntary and thus in violation of the Fifth
Amendment to the United States Constitution.

2.      All statements obtained from Defendant through the use
of Aleksandra Krstic as an interpreter on the ground
that the use of her as an interpreter violated
Defendant's right to family integrity and intimacy in
violation of the Due Process Clause of the Fifth
Amendment to the United States Constitution.

On March 15, 2010, the Court conducted an evidentiary

hearing on Defendant's Motion to Suppress at which Defendant's

daughter, Aleksandra Krstic, and Special Agents Theodore Weimann

and Melissa Cooley testified.  On March 23, 2010, the Court heard

additional oral argument on Defendant's Motion to Suppress and

took the Motion under advisement.

## FINDINGS OF FACT

Having weighed and evaluated all of the evidence, the Court

finds the following facts by a preponderance of the evidence and

resolves material conflicts in the evidence as noted:

On September 29, 2005, Special Agents Weimann and Reece Berg

went to Defendant's last reported address to attempt to interview

him as to his military service during the Bosnian war and other

matters, but the agents determined Defendant had moved.  Having

seen Ostoja Krstic enter an apartment at the same locale, Agent

Weimann decided to speak with him about locating Defendant and

discovered Ostoja Krstic did not speak English well.  Because of

the communication problem, Ostoja Krstic asked Agent Weimann for

6 - OPINION AND ORDER

permission to call someone to assist him in understanding Agent Weimann. Agent Weimann agreed, and Ostoja Krstic telephoned Branka Krstic, Defendant's wife.

After Ostoja Krstic spoke with Branka Krstic in Serbo-Croatian, a language that Agent Weimann does not understand, Ostoja Krstic put Agent Weimann on the telephone with Branka Krstic. Agent Weimann found Branka Krstic spoke English well and did not appear to have any trouble understanding him. Agent Weimann explained to Branka Krstic that he wanted to speak with Defendant and Ostoja Krstic about their immigration applications and asked Branka Krstic if arrangements could be made for them to meet to do so. Agent Weimann also told Branka Krstic that he could interview Defendant at his house or at Agent Weimann's office at a time that was convenient for Defendant. Branka Krstic stated the next day, September 30, 2005, at 11:00 a.m. at Defendant's home would be acceptable.

Before the expected arrival of Agent Weimann at Defendant's residence, Defendant, his wife, and Ostoja Krstic gathered there. They anticipated Agent Weimann wanted to discuss the military history of Defendant and Ostoja Krstic because they knew United States immigration officers had previously interviewed other immigrants from their hometown about this issue. Although this caused some degree of "chaotic" discussion in the household, none of the Krstics took steps to prepare for the interview by

contacting an attorney.

Special Agents Weimann and Melissa Cooley arrived at Defendant's home for the interview on September 30, 2005, at 11:00 a.m. wearing casual, unofficial clothing. Although both agents were armed with their service firearms, they wore the weapons under their clothing so that the guns were not visible, and, in fact, their weapons were never displayed.

The agents were greeted at the door by Defendant, Ostoja Krstic, and Branka Krstic. After the agents showed their credentials, Branka Krstic opened the door and led them to the dining room about 20 feet from the door. The agents took seats at the dining room table and never went anywhere else in Defendant's house. In particular, the agents did not check the interior of the house to see who else was present and did not perform a sweep of the house for their safety.

In the dining room, Defendant sat at the head of the table, the agents sat next to each other on one side of the table, and Ostoja Krstic sat across the table from Agent Cooley. Branka Krstic remained in the dining room throughout the interview.

Before questioning Defendant in substance, Agent Weimann engaged in small talk with Defendant in English and then specifically advised Defendant that he was not under arrest. Defendant understood the agent was not there to arrest him but was there to question him. Agent Weimann did not advise

Defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), because Agent Weimann did not believe Defendant was in custody nor did Agent Weimann inform Defendant that he could choose not to speak with the agents.

Although Agent Weimann believed he and Defendant were communicating adequately in English and that they could conduct the interview without a translator based on Defendant's level of comprehension, Defendant's daughter, Aleksandra Krstic, who was 24 years old and was upstairs at the beginning of the interview, overheard their conversation and concluded Defendant did not fully understand what was being discussed. She yelled downstairs to her parents in Serbo-Croation: "Stop talking. You don't need to talk. You are not required to talk to this guy."

When her parents did not seem to pay any attention to her, Aleksandra Krstic went downstairs into the dining room and offered to translate for her family during the interview. Aleksandra Krstic, who was a business major at Portland State University, had acted as a translator for her parents before, and it was common for her parents to rely on her when dealing with important matters that required an understanding of English.

Aleksandra Krstic conversed with her parents in Serbo-Croation and then with Agent Weimann in English. He asked Aleksandra Krstic whether she spoke both languages well; determined she had done very well in her English studies in the

9 - OPINION AND ORDER

United States; and, based on his conversation with her, believed Aleksandra Krstic's English was "as good as [his]."  When none of the Krstics objected, Agent Weimann agreed Aleksandra Krstic could act as translator.[2]

Agent Weimann tried to conduct a low-key, nonthreatening interview with Defendant with the goal of obtaining Defendant's trust and cooperation.  Accordingly, neither Agent Weimann nor Agent Cooley made any overt display of authority while in Defendant's dining room, and Agent Weimann did not promise leniency, clemency, a reward, or anything of value in return for Defendant agreeing to speak with him.  The Court rejects as not credible Aleksandra Krstic's testimony that Agent Weimann acted in an intimidating, arrogant, and harsh manner.  The Court finds Agent Weimann did not threaten Defendant or his family with any harm and did not suggest anything negative would happen to Defendant or his family if Defendant did not speak with Agent Weimann.

After Aleksandra Krstic agreed to translate, Agent Weimann informed Defendant that he had Defendant's immigration application on which Defendant stated he had not served in the military and that he also had evidence that Defendant had served

---

[2] Based on her presentation as a witness at the hearing, including her responses to questions that the Court asked her directly, the Court finds, in fact, that Aleksandra Krstic communicates very well in English.

in the Zvornik Brigade.  Agent Weimann showed Defendant three documents:  a daily roster for military personnel in the Zvornik brigade in July 1995, which listed Defendant's name; a document showing Defendant was "conscripted into the Bosnian military"; and a document showing Defendant's change of title and position in the Zvornik Brigade in 1995.

Defendant immediately acknowledged the documents were his military records.  Defendant stated he effectively had been forced to join the Zvornik Brigade because otherwise he would have been incarcerated.  He explained he did not disclose on his immigration application that he had been a soldier in the Zvornik Brigade because he was told his application would be denied if he did so.

At some point thereafter, Agent Weimann drafted the following statement for Defendant's signature:

> My true name is Milenko Krstic.  I was born on 11/11/56 in Bosnia-Herzegovina.  I entered the United States at New York City on 8/20/98 as a refugee.  I lied on my refugee application because I believed that if I said that I was in the army, the U.S. would deny my application.  I was in the army from 1992 until the war ended.  I was the lowest rank possible.

Gov't Ex. 1.  Aleksandra Krstic translated the entire proposed statement to Defendant.  Agent Weimann directed Defendant to point out whether the statement was wrong, incomplete, or needed to be clarified in any way, and Defendant confirmed the statement was accurate.  Agent Weimann then asked Defendant to raise his

11 - OPINION AND ORDER

right hand and to swear to the truthfulness of the statement.
With Aleksandra Krstic translating, Defendant did so and signed
the statement at 11:30 a.m.

In addition to asking Defendant questions about his military
service related to the immigration investigation, Agent Weimann
also asked Defendant whether he had any knowledge of anyone's
involvement in war crimes and specifically inquired about the
execution of prisoners at the Orahovac School.  Agent Weimann
told Defendant that Defendant's cooperation in providing
information about the Orahovac School or other war crimes might
help his immigration situation.  Defendant did not have any
advance warning that this subject would be discussed.
Nonetheless, Defendant immediately insisted he did not have any
knowledge about who was involved in the Orahovac School crimes.
Defendant stated repeatedly that he had nothing to do with it.
When Agent Weimann continued to question Defendant about any
knowledge he might have concerning war crimes, Defendant's
answers remained the same:  He did not have any knowledge of war
crimes.

Agent Weimann then confronted Defendant with questions about
an order for 500 liters of fuel signed by him while he was in the
Zvornik Brigade.  Agent Weimann understood the fuel order could
be important because it was believed the fuel was used in the
buses that transported the prisoners of the Orahovac School to

12 - OPINION AND ORDER

their execution site.  Although Defendant acknowledged he had
signed many fuel orders during his time in the Zvornik Brigade,
he did not specifically remember the 500-liter order nor the name
of the individual who directed him to fill this or any other fuel
order.

After Defendant signed the statement about his immigration
documents and Agent Weimann asked Defendant about the fuel order
and his knowledge of war crimes, Branka Krstic asked Agent
Weimann about the immigration consequences to Defendant and his
family as a result of his failure to report his military service.
Agent Weimann informed her that there were possible criminal
consequences to Defendant for lying on the immigration
application, including possible deportation.  Agent Weimann also
stated he would write a report about the interview and submit it
to the United States Attorney's Office where the decision whether
to file criminal charges against Defendant would be made.  Agent
Weimann also pointed out that ICE would make the decision as to
whether to initiate removal proceedings.

With respect to possible immigration consequences for the
rest of the family, Agent Weimann explained that was a more
complicated issue because it depended on whether the family's
applications were "riding on" Defendant's application or whether
they had separate asylum applications.  Because Agent Weimann did
not know the procedural posture of the family's immigration

applications, he stated he could not provide them with a clear answer.

Agents Weimann and Cooley completed the interview and left Defendant's home between 12:00 and 12:10 p.m.

The Court notes Agent Weimann and Aleksandra Krstic testified to markedly different accounts of Agent Weimann's demeanor and Defendant's disposition and mental state during the interview. According to Agent Weimann, Defendant did not appear upset or anxious nor did he appear to struggle to maintain his composure at any time during the interview. Agent Cooley corroborated this perception and testified Defendant did not appear to be upset or distressed. Aleksandra Krstic, however, testified Agent Weimann treated her father harshly and her father was "crushed" and his lip was quivering when the subject of war crimes was introduced. As noted, the Court finds Agent Weimann did not act in the offensive manner described by Aleksandra Krstic. The Court also finds the agents' account as to the issue of Defendant's state of mind to be more reliable than Aleksandra Krstic's exaggerated version.

## DISCUSSION

As noted, Defendant seeks to suppress:

1.    All statements seized as a consequence of the
      interrogation of Mr. Krstic on the grounds that
      (a) said interrogation was custodial and was not
      preceded by a Miranda warning and/or (b) all statements

14 - OPINION AND ORDER

made by Defendant were involuntary and thus in violation of the Fifth Amendment to the United States Constitution.

2.  All statements obtained from Defendant through the use of Aleksandra Krstic as an interpreter on the ground that the use of her as an interpreter violated Defendant's right to family integrity and intimacy in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution.

## I.  Defendant was not in custody, and, therefore, *Miranda* warnings were not required.

Defendant contends he was in custody when Agents Weimann and Cooley interviewed him at his home, and, therefore, he should have been advised of his *Miranda* rights.  Defendant argues the absence of *Miranda* warnings renders his statements and any fruits of the interview inadmissible.  According to the government, however, a *Miranda* warning was not required because the interview was noncustodial.  The Court agrees.

In *United States v. Craighead*, the Ninth Circuit explained:

> [When] the suspect has not formally been taken into police custody, a suspect is nevertheless considered "in custody" for purposes of *Miranda* if the suspect has been "deprived of his freedom of action in any significant way."  384 U.S. at 444, 86 S.Ct. 1602.  To determine whether the suspect was in custody, we first examine the totality of the circumstances surrounding the interrogation. *See Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L.Ed.2d 383 (1995).  We then ask whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Id.; see also Berkemer v. McCarty*, 468 U.S. 420, 442 & n.35, 104 S. Ct. 3138, 82 L.Ed.2d 317 (1984).  Accordingly, taking into account the totality of

the circumstances, we must decide whether a
reasonable person in [the defendant's] position
would have felt deprived of his freedom of action
in any significant way, such that he would not
have felt free to terminate the interrogation.

539 F.3d 1073, 1082 (9th Cir. 2008).  As the Ninth Circuit noted,

however,

> [a]pplying this standard to an interrogation
> conducted within the home presents some analytical
> challenges. . . .  The usual inquiry into whether
> the suspect reasonably believed he could "leave"
> the interrogation does not quite capture the
> uniqueness of an interrogation conducted within
> the suspect's home. . . .  If a reasonable person
> is interrogated inside his own home and is told he
> is "free to leave," where will he go?  The
> library?  The police station?  He is already in
> the most constitutionally protected place on
> earth.  To be "free" to leave is a hollow right if
> the one place the suspect cannot go is his own
> home.  *Cf. Crawford*, 372 F.3d at 1060 (holding
> that an interrogation at an FBI office was not
> custodial because, *inter alia*, the defendant was
> told he was free to leave and "was, in fact,
> returned home at the end of the interview").
> Similarly, a reasonable person interrogated inside
> his own home may have a different understanding of
> whether he is truly free "to terminate the
> interrogation" if his home is crawling with law
> enforcement agents conducting a warrant-approved
> search.  He may not feel that he can successfully
> terminate the interrogation if he knows that he
> cannot empty his home of his interrogators until
> they have completed their search.

*Id.* at 1082-83 (citations omitted).  Nevertheless,

> [a]n interrogation conducted within the suspect's
> home is not *per se* custodial.  On the contrary,
> courts have generally been much less likely to
> find that an interrogation in the suspect's home
> was custodial in nature.  The element of
> compulsion that concerned the Court in *Miranda* is
> less likely to be present where the suspect is in
> familiar surroundings.

16 - OPINION AND ORDER

*Id.* at 1083.  The Ninth Circuit further explained:  "[W]hen applying *Miranda* to the task of sorting a non-custodial in-home interrogation from a custodial one, our analysis considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'"  *Id.*

### A.    The objective standard applies.

Defendant contends the Court should apply a "refined" objective standard when analyzing the nature of the interview. Defendant relies on *United States v. Beraun-Panez,* 812 F.2d 578 (9th Cir. 1987), to support his contention.

In *Beraun-Panez,* the defendant, who was herding cattle in a remote rural area of Idaho, was approached by a deputy sheriff and a Bureau of Land Management Special Investigator who were investigating a range fire.  *Id.* at 579.  The officers interviewed the defendant for 30-90 minutes and asked him at least three times whether he had started the fire.  *Id.*  The officers had investigated the defendant's alien status before the interview and told the defendant that "if convicted, he could be deported but if he cooperated, [the officers] would tell the United States Attorney of his cooperation.  [The defendant] testified that he was told that if he continued to lie, he would be deported and separated from his family."  *Id.*  At one point the defendant's co-worker rode towards the defendant and the

officers during the interrogation, but he was stopped 60 feet away. After a brief conversation with one of the officers, the co-worker returned to work. *Id.* at 580. The defendant initially denied involvement with the fire, but he finally admitted he had set it. *Id.*

The defendant was arrested three months later. *Id.* The defendant moved to suppress his statement, and the district court granted his motion applying a "refined" objective standard to determine whether a reasonable individual in the defendant's situation would have felt free to leave. The Ninth Circuit concluded the district court had properly considered "how a reasonable person who was an alien would perceive and react to [the officer's] remarks," and the court rejected the government's assertion that the district court should not have considered the defendant's status as an alien because "the applicable objective test . . . avoids imposing upon police officers the often impossible burden of predicting whether the person they question, because of characteristics peculiar to him, believes himself to be restrained." *Id.* The Ninth Circuit found "[b]ecause the officers knew that [the defendant] was an alien and, had in fact, taken pains to determine his status before questioning him, and may even have used the information to their own advantage, considering [the defendant's] status does not charge the officers, in this case, with an impossible prescience." *Id.* The

18 - OPINION AND ORDER

court noted "the district court [properly] did not determine how [the defendant] perceived and reacted to the remarks; rather the court focused on how a reasonable person who was an alien would perceive and react to the remarks." *Id.*

Here Defendant asserts the Court should expand the "refined" objective standard set out in *Beraun-Panez* and, when analyzing whether Defendant was "in custody," consider the fact that

> [Defendant] comes from a former Communist state where authority figures are viewed as arbitrary, capricious, and threatening. To an immigrant, a promise by a government agent that nothing will happen means a lot more than a similar promise to someone born and raised in America. Also, the presence of the ICE agents in [Defendant's] home had a far greater coercive impact on him than would have been the case with an indigenous American citizen. To someone born and raised in Communist Yugoslavia, government agents are to be feared and obeyed. Such were the emotions that clouded [Defendant's] mind when he was confronted by the ICE agents.

Def.'s Am. Mem. in Support of Mot. to Suppress at 22.

The government, however, contends the "refined" objective standard in *Beraun-Panez* is of doubtful validity following the Supreme Court's decision in *Yarborough v. Alvarado*, 541 U.S. 652 (2004). In *Yarborough* the Supreme Court reversed the Ninth Circuit and concluded the state court did not err "in failing to account for [the petitioner's] youth and inexperience when evaluating whether a reasonable person in his position would have felt free to leave." 541 U.S. at 60. The Supreme Court

19 - OPINION AND ORDER

concluded the Ninth Circuit erred when it held the petitioner's "age and experience must be a factor in the *Miranda* custody inquiry." 541 U.S. at 660. The Supreme Court noted "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 663 (quotation omitted). The Court concluded:

> Indeed, reliance on [the petitioner's] prior history with law enforcement was improper. . . . In most cases, police officers will not know a suspect's interrogation history. *See Berkemer, supra*, at 430-431, 104 S. Ct. 3138. Even if they do, the relationship between a suspect's past experiences and the likelihood a reasonable person with that experience would feel free to leave often will be speculative. True, suspects with prior law enforcement experience may understand police procedures and reasonably feel free to leave unless told otherwise. On the other hand, they may view past as prologue and expect another in a string of arrests. We do not ask police officers to consider these contingent psychological factors when deciding when suspects should be advised of their *Miranda* rights. *See Berkemer, supra*, at 431-432, 104 S. Ct. 3138. The inquiry turns too much on the suspect's subjective state of mind and not enough on the "objective circumstances of the interrogation." *Stansbury*, 511 U.S., at 323, 114 S. Ct. 1526.

*Id.* at 668-69.

In light of *Yarborough,* the viability of the "refined" objective standard announced in *Beraun-Panez* is of doubtful validity. Even if such a "refined" standard applies, however, the Court notes the record here contains little evidence to which

20 - OPINION AND ORDER

the Court could properly apply it.

Thus, the Court applies an objective standard to determine whether Defendant's statement was voluntary.

**B.   Defendant was not in custody.**

The Ninth Circuit has found

> several factors are relevant to whether the
> circumstances of [a defendant's] interrogation
> effected a police-dominated atmosphere:   (1) the
> number of law enforcement personnel and whether
> they were armed; (2) whether the suspect was at
> any point restrained, either by physical force or
> by threats; (3) whether the suspect was isolated
> from others; and (4) whether the suspect was
> informed that he was free to leave or terminate
> the interview, and the context in which any such
> statements were made.

*Craighead*, 539 F.3d at 1084.   "The determination of whether an in-home interrogation was custodial is necessarily fact intensive."   *Id.* (quotation omitted).

**1.   Number of law-enforcement personnel and whether
they were armed.**

In *Craighead,* eight law-enforcement officers from three agencies entered the defendant's house, several officers were clearly armed and unholstered their weapons, and five agents wore flak jackets.   Here there were only two casually-dressed ICE agents present during Defendant's interview, and the agents were outnumbered by the four Krstic family adults who were present. Although both agents were armed, their weapons were concealed throughout the contact and Defendant was not aware they were armed.

21 - OPINION AND ORDER

2.   **Defendant was not physically or psychologically restrained.**

As noted, Defendant was not physically restrained at any point during his interview, neither agent acted in any way to block his exit or other movements, and Defendant was neither threatened nor promised anything of value in return for agreeing to speak with the agents.

Defendant, however, contends he was psychologically restrained because the government "applied unreasonable coercive pressure" when the agents (1) presented Defendant with evidence of his guilt in a way that would make a reasonable person believe he was not free to leave and (2) instilled Defendant with the fear of losing his family.

Defendant relies on *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982), to support his first contention.  In *Lee* the court provided only scant analysis leading to its in-custody determination:

> [The defendant] was questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house. The agents allowed him to repeat his exculpatory story, then for 15 minutes confronted him with evidence of his guilt, and told him it was time to tell the truth, but did not advise him of his rights.  In such circumstances a reasonably innocent person could conclude that he was not free to leave.

*Id.* at 468.  In contrast, the record here reflects Defendant was interviewed in his home in the presence of three adult relatives

with whom he conversed freely in Serbo-Croation, was presented
with evidence of his guilt, and quickly admitted he lied on his
immigration application.  Accordingly, *Lee* is of limited
relevance to the circumstances of this case.

    Defendant relies on *United States v. Tingle*, 658
F.2d 1332 (9th Cir. 1981), to support his second contention that
he was in custody because the ICE agents instilled him with the
fear of losing his family if he did not cooperate with them.  In
*Tingle*, the Ninth Circuit found the defendant's confession was
involuntary because while the defendant was in the FBI agents'
vehicle with two agents, one agent

> recited a virtual litany of the maximum penalties
> for the crimes of which [the defendant] was
> suspected, totaling 40 years imprisonment.  [The
> agent] expressly stated, in a manner that could
> only be interpreted in light of the lengthy
> sentences he had described, that [the defendant]
> would not see her two-year-old child "for a
> while."  Referring specifically to her child, [the
> agent] warned her that she had "a lot at stake."
> [The agent] also told [the defendant] that it
> would be in her best interest to cooperate and
> that her cooperation would be communicated to the
> prosecutor.  He also told her that if she failed
> to cooperate he would inform the prosecutor that
> she was "stubborn or hard-headed."

*Id.* at 1335-36.  The court reasoned:

> We think it clear that the purpose and objective
> of the interrogation was to cause [the defendant]
> to fear that, if she failed to cooperate, she
> would not see her young child for a long time.  We
> think it equally clear that such would be the
> conclusion which [the defendant] could reasonably
> be expected to draw from the agent's use of this
> technique. . . .  When law enforcement officers

23 - OPINION AND ORDER

> deliberately prey upon the maternal instinct and
> inculcate fear in a mother that she will not see
> her child in order to elicit "cooperation," they
> exert the "improper influence" proscribed by
> *Malloy.* The warnings that a lengthy prison term
> could be imposed that [the defendant] had a lot at
> stake, that her cooperation would be communicated
> to the prosecutor, that her failure to cooperate
> would be similarly communicated, and that she
> might not see her two-year-old child for a while
> must be read together, as they were intended to
> be, and as they would reasonably be understood.
> Viewed in that light, [the agent's] statements
> were patently coercive.

*Id.* at 1336.

Here, *after* Defendant had already made inculpating

statements, Branka Krstic asked Agent Weimann about the possible

consequences of Defendant's admission rather than the agent

raising the issue at the beginning of the interview.  In

addition, unlike the agent in *Tingle*, Agent Weimann did not

respond with a "virtual litany" of maximum penalties but instead

informed the Krstics that the United States Attorney's Office

would make a decision later as to whether to file criminal

charges against Defendant and then ICE would make a decision as

to whether to initiate removal proceedings.  Agent Weimann also

did not provide any information as to the possible immigration

consequences to anyone in the Krstic family other than Defendant

because it was a complicated issue and he did not have all of the

available facts.  Thus, the discussion of consequences did not

factor into Defendant's decision to speak to the agents and

certainly did not serve to coerce Defendant into agreeing to

24 - OPINION AND ORDER

speak.

### 3.   Defendant was not isolated from others.

Defendant was not isolated from his family at any time during the interview.  As noted, the agents and Defendant sat at the dining room table surrounded by Defendant's wife, brother, and daughter.  Aleksandra Krstic translated the interview, and it is undisputed that Defendant and his family frequently conversed in Serbio-Croation to the exclusion of the agents' comprehension.  Moreover, the agents did not attempt to limit or to stop those conversations.

### 4.   Defendant was not told he was free to terminate the interview or to leave.

It is undisputed Agent Weimann told Defendant that he was not under arrest.  The Court notes Defendant did not ask and Agent Weimann did not volunteer that Defendant was free to terminate the interview or to leave if he wanted to do so.

Having weighed all of these factors in the context of the totality of the circumstances, including the facts that there were only two agents with concealed weapons, that Defendant was not physically or psychologically restrained or isolated, and Defendant was in the company of several family members with whom he could converse privately at will, the Court concludes Defendant was not in custody at the time of his interview.  A *Miranda* warning, therefore, was not required.

Accordingly, the Court denies Defendant's Motion to Suppress

25 - OPINION AND ORDER

to the extent it is based on the agents' failure to give *Miranda* warnings to Defendant.

## II. Defendant's confession was voluntary.

Defendant also moves to suppress his statement on the ground that it was not voluntary.

"The Constitution demands that confessions be made voluntarily." *See Lego v. Twomey*, 404 U.S. 477, 483-85 (1972). *See also United States v. Haswood,* 350 F.3d 1024, 1027 (9th Cir. 2003)(same). "The Government bears the burden of proving that [a subject's] statements were voluntary and must do so by a preponderance of the evidence." *Id.* (citing *Lego*, 404 U.S. at 489; and *Tingle*, 658 F.2d at 1335).

A confession is involuntary if coerced either by physical intimidation or psychological pressure. *United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008)(citing *Haswood*, 350 F.3d at 1027). The court must "consider the totality of the circumstances in engaging in this inquiry." *Shi*, 525 F.3d at 730 (citing *United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002)). "The totality of the circumstances contains no talismanic definition of voluntariness." *Haswood,* 350 F.3d at 1027.

A "confession is . . . involuntary if 'the defendant's will was overborne at the time he confessed.'" *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005)(quoting *Lynumn v. Ill.*, 372 U.S.

528, 534 (1963)).  "[T]o render a statement involuntary, coercion must exist to such a degree that the statement is not 'the product of an essentially free and unconstrained choice by its maker.'"  *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).  As noted, the court must consider the totality of the circumstances.  *Shi*, 525 F.3d at 730.

> Relevant factors include:  (1) the time between the defendant's arrest and arraignment, (2) whether the defendant knew the nature of the offense with which he was charged at the time of his confession, (3) whether the defendant was aware that he was not required to make any statement, (4) whether the defendant had been advised of his right to counsel, and (5) whether counsel was present at the time of the defendant's confession.

*Id.* (citing *Gamez*, 301 F.3d at 1144, and 18 U.S.C. § 3501(b)).

The first factor as set out in *Shi* and § 3501 is not relevant to this matter.  As to the second factor, although the record does not reflect Defendant knew the nature of the specific crime of Fraud and Misuse of a Visa at the time he made his admissions pertinent to that offense, Defendant clearly anticipated Agent Weimann was there to question him about his military history in connection with his immigration status.  At least with respect to Defendant's admissions about his immigration documents, this factor weighs in favor of a finding of voluntariness.

With respect to the third, fourth, and fifth factors, the record is sparse as to whether Defendant was aware he was not

27 - OPINION AND ORDER

required to answer Agent Weimann's questions and whether he was aware he could have invited an attorney to be present for the interview.

The Court notes Agent Weimann neither demanded nor used his official status to compel the interview to occur. Although Agent Weimann appeared without warning at Defendant's last known address hoping to find Defendant and Ostoja Krstic there and to speak with them, Agent Weimann discovered Defendant had moved and then merely asked Ostoja Krstic to help him contact Defendant so that Agent Weimann could speak with him. There is not any evidence that Ostoja Krstic or Branka Krstic perceived Agent Weimann as demanding or insisting on the interview as a matter of right nor any evidence that Defendant did not realize he could decline the interview request. Instead, when Agent Weimann suggested the interview could occur either in his office or at the Krstic home, it is significant that Branka Krstic specified the Krstic home as the locale of the interview and set the time for the interview, and Agent Weimann cooperated with that choice. By the time Agents Weimann and Cooley arrived at Defendant's home the next day, there is not any question that Defendant had discussed the prospect of the interview at length with his family and that the discussion was upsetting. Although one can only speculate as to whether there was any discussion about cancelling the interview or seeking help (perhaps from a lawyer) before the

28 - OPINION AND ORDER

interview, the Court notes after the agents were invited to the
dining room table and the questioning began, Aleksandra Krstic
yelled to her parents in Serbo-Croation:  "Stop talking.  You
don't need to talk.  You are not required to talk to this guy."
Because Defendant and his wife were upset at their daughter's
intrusion, the Court concludes Defendant heard his daughter's
outburst.  Still, Defendant ignored his daughter's "warning,"
continued to answer Agent Weimann's questions, and ultimately
signed the sworn summary statement that Aleksandra Krstic
translated.  Moreover, when Agent Weimann asked Defendant several
times about the 500-liter fuel order and war crimes, Defendant
consistently insisted he did not remember anything about either
subject, which is a persuasive example of Defendant exercising
his own will in answering questions in the manner he chose.
Based on these facts and the totality of the circumstances, the
Court concludes Defendant knew he did not have to answer Agent
Weimann's questions in a particular way, and, therefore, it is
also likely he knew he didn't have to answer them at all.

     Similarly, although Agent Weimann did not advise Defendant
of a "right" to counsel because Agent Weimann correctly
understood Defendant was not in custody and, therefore, was not
entitled as a matter of right to the presence of a lawyer, the
lack of any evidence that suggests Defendant even considered
whether he should consult with an attorney persuades the Court

29 - OPINION AND ORDER

that this factor does not weigh against a finding of
voluntariness.

The Court was unable to find any case in which a court
concluded a noncustodial statement was involuntary merely because
an officer failed to advise the defendant that he was free to
obtain counsel, free to terminate the interview, and/or free to
leave the noncustodial interview.  In the absence of any such
authority and considering the totality of these circumstances,
the Court concludes the government has established by a
preponderance of the evidence that Defendant's will was not
"overborne" and his sworn statement, among others, was "the
product of an essentially free and unconstrained choice."
Accordingly, the Court concludes the government has established
Defendant's statements were voluntary for purposes of allowing
their admission into evidence at trial.  The Court, therefore,
denies Defendant's Motion to Suppress on the basis of
involuntariness.

### III. Use of Aleksandra Krstic as an interpreter did not violate Defendant's right to due process.

Defendant asserts the government violated his right to due
process under the Fifth Amendment to the United States
Constitution when they interfered with his familial relationship
with his daughter by allowing her to translate and, therefore,
"treated [her] as a 'mere creature of the state.'"  Defendant
relies on In re Agosto, 553 F. Supp. 1298 (D. Nev. 1983), to

30 - OPINION AND ORDER

support his assertion.

In *Agosto* the adult son of an alleged tax evader moved to quash a subpoena that required him to testify against his father. *Id.* at 1299.   The court granted the motion to quash.

> There can be little doubt that the confidence and privacy inherent in the parent-child relationship must be protected and sedulously fostered by the courts.   While the government has an important goal in presenting all relevant evidence before the court in each proceeding, this goal does not outweigh an individual's right of privacy in his communications within the family unit, nor does it outweigh the family's interests in its integrity and inviolability, which spring from the rights of privacy inherent in the family relationship itself.   There is no reasonable basis for extending a testimonial privilege for confidential communications to spouses, who enjoy a dissoluble legal contract, while yet denying a parent or child the right to claim such a privilege to protect communications made within an indissoluble family unit, bonded by blood, affection, loyalty and tradition.   And further, if the rationale behind the privilege of a witness-spouse to refuse to testify adversely against his or her spouse in a criminal proceeding serves to prevent the invasion of the harmony and privacy of the marriage relationship itself, then affording the same protection to the parent-child relationship is even more compelling.

*Id.* at 1325.

As the court in *United States v. Red Elk* noted, however,

> *Agosto* has never been followed by the Eighth Circuit and has been rejected by virtually every other federal court that has been called upon to recognize and apply a parent-child/family privilege.   *See In re Erato*, 2 F.3d at 16; *In re John Doe*, 842 F.2d at 246-48; *Davies*, 768 F.2d at 896-900; *Port v. Heard*, 764 F.2d 423, 428-30 (5th Cir. 1985); *United States v. Ismail*, 756 F.2d 1253, 1257-58 (6th Cir. 1985); *In re Grand Jury*

31 - OPINION AND ORDER

> *Subpoena of Santarelli*, 740 F.2d 816, 817 (11th
> Cir. 1984); *United States v. (Under Seal)*, 714
> F.2d 347, 349, n.4 (4th Cir. 1983); *In re
> Matthews*, 714 F.2d 223, 224 (2d Cir. 1983); *United
> States v. Jones*, 683 F.2d 817, 818-19 (4th Cir.
> 1982); *United States v. Penn*, 647 F.2d 876, 885
> (9th Cir.)(en banc), *cert. denied*, 449 U.S. 903,
> 101 S. Ct. 276, 66 L. Ed.2d 134 (1980); *In re
> Grand Jury Proceedings of Starr*, 647 F.2d 511,
> 512-13 & n.4 (5th Cir. 1981); *see also, United
> States v. Duran*, 884 F. Supp. 537, 541 (D.D.C.
> 1995); *United States v. Levasseur*, 699 F. Supp.
> 995, 1006 (D. Mass. 1988), *aff'd*, 867 F.2d 36 (1st
> Cir. 1989); *but see, In re Grand Jury Proceedings,
> Unemancipated Minor Child*, 949 F. Supp. 1487,
> 1490-98 (E.D. Wash. 1996); *In re Greenberg*, 11
> Fed. R. Evid. Serv. 579 (D. Conn.1982).

955 F. Supp. 1170, 1178 (D.S.D. 1997).  In *Penn* the Ninth Circuit

noted in *dicta* that "[t]here is no judicially or legislatively

recognized general 'family' privilege."  647 F.2d at 885.  Thus,

it does not appear the Ninth Circuit would likely adopt the

privilege set out in *Agosto*.

Even if the Ninth Circuit did adopt the reasoning of *Agosto*,

however, that case does not establish the government violated any

due-process rights of Defendant when his adult daughter acted as

his interpreter.  It is undisputed that Aleksandra Krstic

volunteered to translate, Agent Weimann accepted her offer to do

so, and there was not any verbal or nonverbal objection by

Defendant, Branka Krstic, or Ostoja Krstic to her acting as

translator.  In these circumstances, there is not any basis to

concluded that Aleksandra Krstic acted as an agent of the

government when she acted as a translator.  *See Throop v.*

32 - OPINION AND ORDER

*Jacquez*, No. CV 05-04312 ABC (SS), 2009 WL 5386125, at *10 (C.D.
Cal. Oct. 27, 2009)(the petitioner's Fifth Amendment right to due
process was not violated because he failed to establish his
mother acted as an agent for the police or that she interrogated
him and Petitioner did not have a clearly established federal
right to confidential communications with his mother).

The Court, therefore, denies Defendant's Motion to Suppress
on this basis.

## IV.  Summary

Under the totality of the circumstances, the Court concludes
the government has established Defendant was not in custody, and,
therefore, he was not entitled to a *Miranda* warning; that
Defendant's statements were voluntary; and that the use of
Aleksandra Krstic as an interpreter did not violate Defendant's
right to due process.  The Court, therefore, denies Defendant's
Motion to Suppress.


## CONCLUSION

For these reasons, the Court **DENIES** Defendant's Motion (#20)

to Suppress.

IT IS SO ORDERED.

DATED this 20th day of April, 2010.

ANNA J. BROWN
United States District